The next case on the docket is 513-0522, Gill v. Edwards. Counselor, at your seat. It please the court, Counsel Lane Harvey. I represent the appellant in this case, June Gill. This case involves a claim made by Ms. Gill for reformation of the deed. In this case, Ms. Gill and her husband owned some real estate in Saline County. There was a coal mining lease executed on that real estate between the Gills and Kerr-McGee in April of 1990. When that coal mining lease was executed and recorded, the effect of that, among other things, was that there was a separate tax bill entered. Our tax ID number attached to the mineral estate so that after that was done, there would be a tax bill, a real estate tax bill for the surface, a separate real estate tax bill for the mineral interest. The coal lease provided that royalties would be paid upon the mining of the coal. But in the interim, there would be an annual payment made to continue the lease in effect. Mr. Gill died in 1997, so that Mrs. Gill succeeded to the interest. In 1998, Mrs. Gill executed a listing agreement to sell the acreage with Home Finders Realty and Bettins, Century 21 agency. The listing agreement is important in this case for a couple of reasons. The listing agreement first contained a provision in paragraph 15, which made it very clear that by entering into the agreement, Mrs. Gill consented that a sales representative of that agency could represent the buyer. The same agency could represent the buyer and the seller in the transaction. Next, the listing agreement made it very clear that the minerals were not offered for sale with the property. Next, in describing in the listing agreement the interest in the property that was to be conveyed in the sale, the listing agreement used the tax ID numbers. The real estate tax ID numbers that it used were the surface tax ID numbers, and it omitted the mineral tax ID number. After that listing agreement was entered, the defendants who had been dealing with another agent from the same agency, Ms. Corrales, came to look at the property. Now, Ms. Corrales in this case, and I think that if you look at the record, it's very clear that Ms. Corrales was the agent of the defendants. We know that because, and we've outlined this in our brief, that Ms. Corrales had been showing the defendants properties prior to this time. The defendants contacted Ms. Corrales at various times about looking at property, and Ms. Corrales contacted the defendant about looking at Ms. Gill's property. Is she a Century 21 agent? She is a sales representative of the same agency. Agency, right. Yes, ma'am. In this case, a Ms. Brooke, whose name has changed in her affidavit, reflects that after this. We'll refer to her for this as Ms. Brooke. Ms. Brooke was the listing agent for Ms. Gill. Ms. Corrales was the lady who was showing the defendants the land and who had suggested that the defendants look at it, and I think the record is pretty clear in this case that Ms. Corrales was acting with the defendants. Ms. Brooke was acting with the plaintiff. They were both sales representatives for the same Century 21 agents. In this case, on May 30th of 1998, Ms. Corrales brings the defendants to the plaintiff's property. The defendants look at it. What's significant in this case is the defendants make an offer to buy plaintiff's property. The offer differed somewhat from the terms of sale because if you look at the agreement, the agreement says it attaches a rider one to the agreement that says the offer is contingent upon their selling some property they own in Chicago. But there was no change in the sale price. No change in the sale price. But the property offer, and what's significant, Your Honor, is the offer on the real estate purchase agreement offered by defendants defined the property being purchased, the interest being purchased by the sales tax ID numbers, or excuse me, the real estate tax ID numbers. The real estate tax ID numbers excluded the mineral interest. The real estate tax ID numbers were absolutely congruent with the real estate tax ID numbers that were in the listing agreement, which clearly on its face precluded the fact that any minerals were going with the property. So the offer that was received by Ms. Gill said that the defendants, the Edwards, want to purchase an interest in the property defined by the real estate tax ID numbers that included only the surface. Those real estate tax ID numbers used by the defendants to define what they were wanting to purchase, again, were absolutely the same as was in the listing agreements, which clearly on its face indicated that the minerals wouldn't go. So pursuant to that circumstance, Ms. Gill accepted the offer with the contingents. Now, we know that the offer was made by the defendants with the assistance of their agent, Ms. Corrales, because on the fourth page of the sales contract when it says here in a circle, the line says seller accepts. So the offer was made by defendants to seller on precisely the terms that she had agreed to sell. In the listing agreement, except for the right. Mr. Harvey, I think in the briefs they talked about two different agreements, the MLS, MSL. Yes. Agreement also. And how, was that just a general agreement that anybody that's an agent? Yes, ma'am. It's a multi-listing agreement in which the consent from Ms. Gill was that the Century 21 agent could put it in other companies' listings so that everybody could look at it. So presumably then this agent would have had that as well as the actual agreement. Yes, ma'am. And that's a very important point because of this. Ms. Corrales had been contacted prior to the time that the defendants ever came to the plaintiff's property, and Ms. Corrales had been showing them around. The only possible ways that the record reflects that Ms. Corrales could have known anything about the plaintiff's property being for sale was either she could have seen the listing agreement in the agency or she could have seen the multi-listing agreement. In both cases, she would have known that the minerals were not being offered for sale. And as the agent of the defendants, at a minimum, as a matter of law for the reasons we've outlined in the brief, her knowledge would have been attributable to the defendants. So it is very important that we understand that those are the only ways that Ms. Corrales could have known this property was for sale. Now, with respect to the summary judgment, what proof was there regarding this imputation of knowledge? Well, the proof was... And what do you think is still genuine issues of fact? Well, I guess I want to say two things about that, Judge. First of all, I don't think there is a genuine issue of fact that the written sales agreement reflects the intent of the parties. And if you find... So you're saying it's more just a question of law? No, I'm saying there's two things. There's two motions for summary judgment. I'm saying in the first instance, as to the plaintiff's motion for summary judgment, I don't think there is an issue of fact. In fact, I think as a matter of law, the contract reflects the intent of the parties for the reasons I just outlined in the facts. Then can you tell me, how is the deed deficient? The deed is deficient because what the deed doesn't do is it doesn't sever the mineral interest from the service. The deed doesn't cause the plaintiff to retain the mineral interest. It does say subject to reservation and that type of language, but that's not enough. No, what it has to say is in the conveyance clause, essentially it has to say that the plaintiff reserves the mineral instead. The only reservation on mineral documents that were on record at the time the deed was executed was the coal lease. The coal lease does it by itself for purposes of the plaintiff retaining the mineral estate, ownership of the mineral estate. The coal lease doesn't separate the mineral estate from the service. The deed should have had a provision in it, in the provision, the conveying provision, that accepted, EX, accepted the mineral estate from the conveyance. Had it done that, then it would have complied with the intent of the parties. So the first point, Your Honor, and I think as a matter of law the reason we filed a motion for subject judgment is we think, for the reasons I've indicated, that the parties expressed what they intended to do in the sales contract. Now, the point about a lot of these reformation cases, many reformations, as you may know, arise out of oral kinds of discussions about what we're going to do and what we're not going to do and confusion of that sort. In this case, we have a written manifestation of the party's intent that is clear and, in my view, unequivocal on its face. Was there any exchange, verbal exchange, between the sellers and the buyers? That's a good question, Judge, because that depends on which of the Edwards' various stories you believe. Because the Edwards have told at least three stories about that. Mr. Edwards says ultimately in his deposition he doesn't remember whether there was or not, first. Second, Mrs. Edwards, in the answer to the complaint, and I'm trying to keep straight here, but we've detailed this in our brief. In the answer to the complaint, they say that it was discussed fully, and in the interrogatories they say it was never mentioned or vice versa. But they've told three different versions of that. Well, would that be extrinsic evidence that should have been considered, or is it your position that you just stay within the contract? Well, my first position is this, Judge. My first position is the contract speaks for itself because it's clear, unequivocal, and, in my view, there's no question that it expressed the intent of the parties. If the contract is applied, then a reformation should have taken place and our motion should have been granted. If you say that there's any ambiguity in the contract that requires us to go beyond the contract to extrinsic evidence, then we've got a question of fact that precludes the granting of defendant's motion for summary judgment. And that question of fact arises in this regard. First of all, as we have detailed in our brief, we have multiple versions of the story from the defendant, from the defendant. Now, you can— Let me ask you, did you take—did you get to the point in the case of taking Ms. Corrales' deposition? She met with the defendants and talked to them and helped put together the offer. We did not, and there's a point to be made about that. Ms. Corrales was a defendant's agent in this case. Right. For purposes of the point I'm making, she is a person under their control. If you look at the Berry v. Breed and the—you may be familiar, Judge, with the IPI instruction that says if you don't produce evidence in your favor, then there's an adverse inference. That's the law in this case. We've cited that in our brief. So it's a strategy that you weren't going to take her deposition? Well, the strategy was just simply this, that she's not our agent. I understand. And so we didn't take her deposition. What our agent said, Ms. Brooke—and this is important in this case because it contributes to the question of fact—if you look at paragraph 8 of Ms. Brooke's affidavit, what Ms. Brooke says, when she's showing properties to buyers—and you have to understand, this affidavit is made more than a decade after the sale. She says it's her custom and practice to discuss with them whether or not mineral rights would go. She then says, Now, the importance of that is in our Rule of Evidence 406. Rule 406 says, So if you go beyond the contract, at a very, very minimum, Ms. Brooke's evidence of what her habit would have been creates a question of fact, which would have precluded the granting of summary judgment for the defendant. So we have three options here. The court does. We can either go for the defendant, the plaintiff, or sit in the back. Yes, ma'am. And as I say, obviously my preference is that you go to the plaintiff. I don't need to go there. But from a very realistic point of view, I think the first issue you have to decide in that regard, especially since it was the defendants who made the offer and made an offer that was exactly congruent to the listing agreement, do we need to even go by the contract to get past the contract? Because I believe because of that, the contract specifies the meeting of the minds. Because clearly, clearly, Mrs. Gill would not have accepted the condition if they had included the number for minerals. Now, I understand that Mrs. Gill is incapacitated now. That's correct. She has dementia. Okay. Was there any issue about her competency? No, not at that time. No. Okay. No, Mrs. Gill at that point, as far as anybody is aware, Mrs. Gill's dementia actually has been a fairly recent onset. It was after this case was filed. And this isn't in the record, obviously, but I met with her. But it was after this case was filed that it was determined that she needed a guardian. But there's no question at that time that she was competent. So where the offer, as I say, where the offer was made by defendants, in a way it was absolutely congruent with what she had expressed her willingness to do with the real estate agency. I'm hard put to see how when she accepted what she understood that to be, she can be penalized because we are now told, much after the fact, that the defendants didn't know what they were doing. And the interesting part of that is, in the depositions, the defendants admitted explicitly that the use of the tax ID numbers was clear and that they intended to buy only what was described in the tax ID number. What about a title search? Well, and it's interesting that you – Because that certainly was one not done. Well, the title search was done after the contract by those on behalf of the defendant. My submission to the court would be that the defendants were on a minimum constructive notice of the circumstances for a couple of reasons. First of all, obviously, the mineral lease was filed. So they knew the mineral was stated. So, I'm sorry to interrupt you, but doesn't the title search show that the mineral rights were reserved? Well, the mineral rights were not reserved. The mineral rights had been leased. Okay. Yeah, a title search would clearly have reflected the existence. And I know that the defendants had a title search done, but the mineral search would have reflected the existence of the lease. Because it had a different tax ID? Not only because it had a different tax ID, but it's like an oil and gas lease. It's a separate interest in the land that gives the coal company not ownership of the minerals, but the right to mine them. So, they have this search that explains that. I believe that – they had the search done, and I believe that it should have, Judge, but the – Is it in the record, do you know? The record – Because we talk about actual notice versus constructive. I would say that at least on constructive notice, I don't recall whether the minerals were part – I don't believe that the minerals were searched in the title search. I believe they were specifically accepted – again, he asked – accepted from the search. And that general language, subject to. Yes. So that – but that kind of means it may not be or it may be, right? Well, and I guess the question I have is one of the reasons it strikes me that it may have been accepted is because everybody understood it wasn't being conveyed. And the other thing about that is – and this is significant in this case – for 10 years after this transaction was completed, Ms. Gill got the real estate tax bill for the lease. She got the payments for the lease. And it was only after 10 years that somebody said, oops, wait a minute, this got conveyed to them. And in that interim, at no point did the defendant say, hey, wait a minute, why aren't we getting the taxes on the minerals? Why aren't we getting the payment on the minerals? So I think in that regard, Your Honor, the record suggests summary judgment should have been entered for us or in the alternative, it shouldn't have been entered at all. Thank you. May it please the Court. Counsel. I'd like to begin by touching upon some of the facts that Mr. Harvey has alluded to here today. We are of the position, and we take issue with the statement, that the sales contract is congruent with the MLS listing. It is not. If you look at the sales contract, it defines the property with a shorthand legal description. It defines it as section 26, range 7, or township 7, range 5. And then it has the specific northeast quarter, et cetera. And there's no exception, there's no reservation of the minerals in that sales contract. So our position is that the sales contract is consistent with what happened at the closing a month later when the deed is executed. Okay. So you're saying that the MLS had the language of the exception, but the actual contract did not? Correct, Your Honor. It is undisputed that my clients did not see that MLS sheet. It's their testimony. They never saw that until 2010. There's no testimony by Ms. Brooks that she showed them that MLS sheet. There's no testimony by Ms. Corrales that she did. I also take issue with the plaintiff's position that the only way Ms. Corrales could have known about this property being for sale is the MLS listing. She worked in the same office as Ms. Brooks. There very well could have been a conversation between them two about the property. And we don't know, Ms. Brooks did not say, I told Ms. Corrales that the minerals were accepted, the minerals were not to pass. Well, if she worked in the same office, would she not have access to the MLS? I would assume she has access, but that's not on the record. We don't know what she saw. Now, I presume that there's nothing going on on the surface as far as work that would be noticeable? My clients live on the property. They became aware of this issue when the coal mine came to do some work on the surface in 2010. And that's the first time? Yes, that is. On Ms. Brooks' affidavit, I would like to point out that she swears that her custom and practice currently is to tell buyers that she is showing property about whether or not the minerals pass. That's an issue. She doesn't tell us that's what her custom and practice has always been. Mind you, this was in 1998. And also, she was not showing the buyers the property on that day. They had their own agent. They had Susan Corrales there, and that is in the record. A title search. He had talked about a title search on the property. That did not cover minerals, and the title commitment issue did not cover minerals. So to say that the mineral lease would have been found is not correct. That's not in the record. In fact, there was testimony by Bruce Toley, the writer of the insurance policy, and he testifies in his deposition, and this is in the record, that he never insures minerals. They're always accepted, regardless of whether or not minerals are passing in that transaction or not. So I think that's important to note. Moving back a little bit, this hasn't been specifically addressed. The plaintiffs have the burden here. The defendants have come forward with a motion for summary judgment and shown that the plaintiffs need to prove their case. So the plaintiffs need to come forward here with the evidence to prove a reformation claim. A reformation claim requires the plaintiffs to show the court proof of certain elements. The elements are mutual mistake of fact and that that existed at the time the deed was executed. The deed was executed in June of 1998. The burden of proof for them is very high in a reformation claim. I talk about this in my brief. Specifically, and I think it's worth citing again and quoting, I would cite to the Department of Conservation v. Novois. It's a fifth district case, and they talk about the burden on a plaintiff in a reformation case. They say that the quantum of evidence required to reform a written instrument is substantial. A preponderance of the evidence will not suffice. Rather, the evidence must leave no reasonable doubt as the mutual intention of the parties. It also says the burden of proof for one claiming mutual mistake is extraordinary, no reasonable doubt. So the plaintiff has to show you beyond all reasonable doubt that not only did Ms. Gill intend to reserve the minerals at the time of the deed, but that my clients intended to acquire only the surface at the time the deed was executed. Do you believe that she didn't intend to reserve the minerals? Ms. Gill? Yes. I think that looking at the MLS, at the time the MLS was executed, whenever that was prior, she intended to reserve them. She wrote that on there. There's a gap in time between the MLS, the sales contract, and then again a gap between the sales contract and the deed. So they have to show at the time the deed was executed in June that my clients did not intend to acquire the minerals. Counsel, let me ask you a question on potential remedies. Earlier we had three potentials outlined. Affirmed, reverse and derail for the plaintiffs, or send the thing back and say, hey, there is genuine issue of material fact. Now, you both came to the trial court and you said there's no genuine issue of material fact. We got cross motions for summary judgment. And recently coming from the trial court, we'd like to hear that. That means this sounds like a four or five day trial trying to figure out what the intent of the parties were. And the court in its order said the parties tell us there is no genuine issue of material fact. So you didn't address that third potential remedy that this court say there's issues of fact and an appropriate remedy would be to send it all back for trial. Do you think we can do that if we're so determined? Of course you can do that. I don't believe you should. I do not believe there's a material issue, an issue of material fact here. Well, my concern was where the parties have said there's no issues of fact. I see what you're saying. We're essentially agreeing that there needs to be a decision on motion for summary judgment. We're essentially saying there is not an issue. So, yes, my position would be that they have already foregone that argument that there is. I think it would argue actually both saying, in your opinion, that we should believe certain factual evidence, and then there's no question of material fact. Because I thought I heard Mr. Harvey say, for example, that your clients have said three different things. So certainly he believes there's an issue of material fact. If they were to, if someone were to find that, in fact, they knew or they said they knew. Let me address that. I disagree with his characterization of my client's statements as being three different versions of the story. But isn't that an issue of material fact, if there were three different versions? There were not three different versions. The complaint, the first version he's referring to is our answer to the complaint. And this is what we said in the complaint. We said that, excuse me, the parties to the agreement discussed sale of the entire property and that no exception or reservation of mineral rights was ever discussed. So that's the first statement he's referring to. The second statement is in our interrogatories where we say that the question was, identify the people with whom you have had communication concerning the purchase of any or all of the mineral rights of the subject real estate. Our answer was June Gill, Susan Corrales, Marcy Brooke, bank staff at Ventura Bank. Names not at this time recalled. All conversations about the real estate included the mineral rights as the mineral rights were and are a part of the real estate. And no mention of an exception or reservation of the mineral rights by plaintiff was ever made to defendants. That's not two versions of the story. They're saying that they've talked about the property. No one's told them there's an exception or reservation. Mineral rights are included in the property. So it is our position that there has not been different versions. The only people who have and can at this point talk about the defendant's intention are the defendants. They're the only people that have come forward to say this is what we're thinking. This was our intentions. There's been no one to come forward and say, well, they told me at the time that the minerals were not passing to them. Or I have heard a conversation they had with someone else about that. So, and attention is a very personal thing. I can intend to do something and not tell other people about it. So they're the only people that have spoken to that fact. The issue of notice was brought up. What notice they may or may not have had or could have had at the time this deed was executed. It is our position, and we set this forth in our brief, that notice is not applicable here. We talk about notice when we talk about subsequent bona fide purchasers for value. When they should have had notice that something earlier in the chain of title was askew from what they thought it would be. So if I'm purchasing property and I shouldn't have seen this deed earlier on that was given to John Smith for the same property, I want notice that I may not have clean title. Well, here we're dealing with the original parties to the transaction, and so it's our position that notice should not apply. Alternatively, if you find that notice should apply and you want to know what notice they had, there's been no evidence that they had actual notice of Gil's intention, if her intention was, in fact, at the time of the deed to exclude minerals. They didn't see the MLS listing. There's no one that says they told the Edwards about her intention. The fact that there's a mining lease on the property does not give them notice that the minerals are going to pass or not pass. If there's a mineral lease, I can still convey the mineral interest. And so they didn't have actual notice. What notice they may have had or should have been imputed with, again, the MLS listing, there's no indication they had any access to that. We don't have Susan Corrales to tell us yes or no that she saw that. So we don't even know what knowledge she had. We can't impute my clients with knowledge that we don't know that their agent had. In conclusion, I do believe that this Court should affirm the decision of the trial court. If you have any additional questions. I have an additional question, and this is naivety. So if you have separate tax IDs, that does not mean that there is a separate, that there's an ownership separation. You can have the tax ID with a lease situation. Correct. Which is what applies here. Correct. Okay. So when there's talk about severing the estate, legally do you think that applies only to an actual estate fee separation versus a lease? I do, yes. Okay. One quick point on that is in the depositions of my clients, you'll note that they state they didn't know at the time what a tax ID number was. They assumed that the tax ID number was consistent with a legal description on the sales contract. What age group were these people in? I would hate to guess. I think at this point they're in their 50s, so I would say in their 40s at the time. Okay. So they didn't know what a tax ID number was, but they did know surface mineral rights versus buying the entire property. Their accounting was that they were not familiar with minerals per se. They intended to purchase everything that came with the property, everything above it, below it, lock, stock, barrel, those types of things. Thank you. Thank you. Thank you both. Yes, thank you. I would submit, if it pleases the Court, that the most significant thing about Counsel's argument is what she didn't say. I told you in the beginning the facts of this case are that her clients offered, made an offer to buy the interest that was congruent with the interest not in the MLS but in the Century 21 listing agreement. Now, that wasn't attached, and I don't have the record available, but are you saying that it does say in there that, because I thought she just said it doesn't say in there that there's an exception? Yes. If you look at the listing agreement, it's attached to the affidavit of Ms. Brooks that was an exhibit to the motion for summary judgment. Okay. The listing agreement says, first, that it reserves the minerals, second, and if you look at the next to last page of the listing agreement, it's very clear, it's underlined, we're not selling minerals. And if you look at the page. That's not the MLS. That's not the MLS. That is the listing agreement. That's the listing agreement. And I'm not questioning you. No, no. That's why her reference to the MLS is confusing, Judge, because it's inaccurate. Because there are two things. There's the MLS, which is sort of the general all-purpose blurb that you put in the newspaper or whatever, so. Online now. Yeah. I'm way out of that. I'm beyond that. In the listing agreement, in listing with the agency, in listing the interest to be sold, it is described with the tax ID numbers. And those are precisely and exactly the tax ID numbers that her clients put on the offer to purchase to define the interest that they wanted to purchase. So the tax ID number of the reserved mineral rights are there as well in saying that they're accepted? The tax ID number is not on here because the minerals are not being conveyed. Well, hang on. But you said that. Yeah. The tax ID number of the minerals was separated under statute when the lease was entered into and recorded in 1990. In defining, and for reasons, this is the way that this agency defines property. In defining what's being conveyed, they use the tax ID numbers. They do not include, and the evidence or the depositions of the defendants make it clear, that it did not include the tax ID number of the minerals. Their agent, and this is another point she never addressed, she admits to you, contrary to what the trial court found, she admits to you that Corrales is her folks' agent. Corrales had the data. There's no question about that. She couldn't have known about the property of those. But this isn't a case against the agent. No, ma'am, it isn't. But Corrales, for the reasons we put in the brief, Corrales' knowledge is attributed to her clients. Corrales prepared the offer which excluded the tax ID number of the mineral interest. She's never addressed that issue. She doesn't address it in the brief. She doesn't address it in the argument. She doesn't address in the brief or in the argument how it can be concluded that the agreement did anything other than to express the intent of the parties. And the intent, as is reflected on the face of the agreement, is that the surface be sold and that the only contingency in the offer was the sale of the property in Chicago. Now, do you know whether or not the Gills and Edwards ever had a conversation? Is that something we're going to get to figure out? In 2010, they had a conversation. Oh, I know. But I think frequently it's just the realtors and their clients. And maybe they are face-to-face at the closing and that's it, right? Well, they were face-to-face that day, the day they interviewed the property. Because they were. Yes, they were. Ms. Gill was present. Ms. Brooks was present. Ms. Corrales was present. The defendants were all present on the day that the offer was made and accepted. And the offer was made and accepted on the Gill property. And the point of all that was after they did all this, this is the offer that was generated by the defendants. And it did not include the tax ID numbers for the minimums. Now, Counsel, you've asked for the alternative relief of finding a genuine issue of material fact exists as to both motions for summary judgment. Let me ask you the same question I asked Kerr. And you've asked for that alternative relief. Are the option three that we might have any reason why we can't do that? I don't see any cases cited in support of that option. If you look, Judge, at the first part of our argument, there is a case cited that just because both sides move for summary judgment doesn't mean the court has to grant it. The purpose of the summary judgments here are worlds apart in terms of the basis. If you believe that the contract conclusively sets forth the intent of the parties and you don't go beyond it, as a matter of law, the deed doesn't comply with that intent. If you don't accept that and we do have to go past that, then you've got multiple reasons for factual issues, including the various and inconsistent stories of the defendants, plus the fact that Ms. Brooks' statement of evidence is mischaracterized. I think you made your point. Thank you for answering my question. Thank you. Thank you. The case will take another advisement. In due course, we'll get it ordered.